IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Gerren Amiker, )<br>    Plaintiff, )<br>  vs. )<br>Carolyn W. Colvin, Acting )<br>Commissioner of Social Security,[1] )<br>    Defendant. )<br>_____) | Civil Action No. 6:12-2886-RMG-KFM<br><br>**REPORT OF MAGISTRATE JUDGE** |

    This case is before the court for a report and recommendation pursuant to Local Civil Rule 73.02(B)(2)(a) DSC, concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[2]

    The plaintiff brought this action pursuant to Sections 205(g) and 1631(c)(3) of the Social Security Act, as amended (42 U.S.C. 405(g) and 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security denying his claim for supplemental security income benefits under Title XVI of the Social Security Act.

## ADMINISTRATIVE PROCEEDINGS

    The plaintiff filed an application for supplemental security income ("SSI") on November 16, 2006, alleging that he became unable to work on June 5, 2003. The application was denied initially and on reconsideration by the Social Security Administration. On September 11, 2007, the plaintiff requested a hearing. The administrative law judge ("ALJ"), before whom the plaintiff and Rebecca Bruce, an impartial vocational expert,

---

[1] Carolyn W. Colvin became the Acting Commissioner of the Social Security Administration on February 14, 2013. Pursuant to Fed.R.Civ.P. 25(d), Colvin should be substituted for Michael J. Astrue as the defendant in this case.

[2] A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

appeared on July 30, 2009, considered the case *de novo*, and on November 13, 2009, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended. The ALJ's finding became the final decision of the Commissioner of Social Security when it was approved by the Appeals Council on August 2, 2012. The plaintiff then filed this action for judicial review.

In making his determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the ALJ:

(1)    The claimant has not engaged in substantial gainful activity since June 5, 2003, the alleged onset date (20 C.F.R § 416.971 *et seq*).

(2)    The claimant has a severe combination of impairments that includes a brachial plexus injury of his nondominant left arm, status-post fractures of the left clavicle and scapula, and a transverse fracture at C6 (20 C.F.R. § 416.920(c)).

(3)    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 416.920(d), 416.925, and 416.926).

(4)    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. § 416.967, which is unskilled in nature, does not involve any use of his nondominant left upper extremity, requires no more than occasional stooping, kneeling, and crouching or more than occasional overhead use of his right upper extremity, and involves no crawling or climbing ladders, ropes, or scaffolds.

(5)    The claimant does not have any vocationally relevant past work experience (20 C.F.R. § 416.965).

(6)    The claimant was 19 years old in June 2003 and is currently 25 years old, a younger individual age 18-49, on the date the application was filed (20 C.F.R. § 416.963).

(7)    The claimant has a limited education and is able to communicate in English (20 C.F.R. § 416.964).

2

(8)    Transferability of job skills is not an issue in this case because the claimant did not perform any skilled work during his vocationally relevant past (20 C.F.R. § 416.968).

(9)    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R. §§ 416.969 and 416.969(a)).

(10)    The claimant has not been under a disability, as defined in the Social Security Act, since June 5, 2003, the date the application was filed (20 C.F.R. § 416.920(g)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). "Disability" is defined in 42 U.S.C. § 423(d)(1)(A) as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions. An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment that equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment that prevents past relevant work, and (5) has an impairment that prevents him from doing substantial gainful employment. 20 C.F.R. §§ 404.1520, 416.920. If an individual is found

3

not disabled at any step, further inquiry is unnecessary. *Id.* §§ 404.1520(a)(4), 416.920(a)(4).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82–62, 1982 WL 31386, at *3. The plaintiff bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5). He must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. *See Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct

4

a verdict were the case before a jury, then there is "substantial
evidence."

*Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citation omitted).

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings and that his conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## EVIDENCE PRESENTED

The plaintiff was born in 1984 and was 19 years old on the alleged disability onset date. He had completed the ninth grade, was able to read and write, and had limited work experience (Tr. 41, 118-20).

On June 9, 2003, the plaintiff presented at the emergency room following a car accident in which he sustained fractures to his left clavicle and left scapula, a transverse fracture of the cervical spine at C6, and a left brachial plexus injury[3] (Tr. 321, 330-40, 343). A repeat MRI on June 10, 2003 revealed apparent avulsion of the left C7 nerve foot with a fluid collection attending into the neural foraminal and in the spinal canal to C5-C6 and inferiorly to T1. Evaluation of nerve root injury was limited as it was not a high resolution MRI. If clinically indicated, a higher resolution MRI or EMG could be performed (Tr. 341-42)

On June 11, 2003, the plaintiff underwent surgery to repair the left clavicle and left scapula fractures (Tr. 329-30, 334); the surgery was considered successful, and he was discharged from the hospital the next day. The treating surgeon alerted the plaintiff that because of the brachial plexus injury, he would "never ha[ve] a normal functioning left upper

---

[3] The brachial plexus is a group of nerves that run from the lower neck through the upper shoulder area, and allow the arm, forearm, and hand to move and feel. Damage to the brachial plexus nerves can cause muscle and sensation problems in the arms, hand, or wrist, as well as pain. *See* National Institutes of Health, Medline Plus, "Brachial Plexus," at http://www.nlm.nih.gov/medlineplus/ency/article 002239.htm (last updated Feb. 16, 2011).

extremity" and might not regain feeling in his arm (Tr. 343-44). The plaintiff was instructed to wear a collar while the C6 spinous process fracture healed, to wear a sling on his arm, and to attend therapy (Tr. 345). He was prescribed Percocet for the pain (*id*.). On July 6, 2003, the plaintiff was seen for increased pain in his left shoulder (Tr. 226).

In August 2003, was seen at a follow up appointment by Dr. Michael Tucker. X-rays revealed that the plaintiff's clavicle and scapula were "well healed." The x-ray also showed anterior dislocation of the left humerus into a subglenoid position (Tr. 206-07). Dr. Tucker noted, however, that the plaintiff had "significant atrophy and wasting of the left upper extremity, with no voluntary movement." (Tr. 206). Dr. Tucker recommended an EMG and referred the plaintiff to Dr. Fulcher, a specialist in the hospital's hand/upper extremity clinic (*id*.).

The next report of treatment in the record is from March 2004, when the plaintiff presented at the emergency room with shoulder and neck pain and "nerve problems." (Tr. 213). X-rays of the plaintiff's cervical spine were normal; they indicated normal vertebral alignment, and no fracture was seen (Tr. 219). X-rays of the dorsal spine were also normal (Tr. 220). On August 24, 2004, the plaintiff had an x-ray of his left shoulder which showed an inferior subluxation of the humeral head from the glenohumeral joint (Tr. 235).

On September 28, 2004, the plaintiff visited the emergency room reporting pain in his collarbone, scapula, abdomen, and back (Tr. 268). He said that he had chronic pain since his accident. He was given Naproxyn and discharged (Tr. 268-70, 274). On November 14, 2004, the plaintiff returned to the emergency room with left arm pain (Tr. 263-64).

On July 3, 2005, the plaintiff visited the emergency room and reported acute arm pain and associated insomnia (Tr. 249, 252). He had chronic left upper extremity pain and left upper extremity muscle atrophy due to nerve damage from left shoulder dislocation.

6

He was given a prescription for Ambien and Tylox, and released the same day, with instructions to see an orthopedist (Tr. 250-53). There is no indication that he followed up on these instructions.

In October 2006, plaintiff visited a chiropractor, complaining of pain in his back and shoulder (Tr. 291). He indicated that the pain became worse when he moved or turned his neck and better when he held his head up (*id*.). He visited the chiropractor 18 times between October 2006 and February 2007 and received some treatment to his neck; the treatment notes indicate that he reported some improvement (Tr. 291-305).

The record includes reports from various state agency physicians and consultants dating back to 2004, when the plaintiff filed his first application for benefits. First, in August 2004, consultative physician Eugene McManus, M.D., examined the plaintiff (Tr. 236-38). He observed "marked atrophy of the left shoulder and all the way down to the arm and hand and fingers," noting also that the plaintiff had to use his right arm to move his left (Tr. 237). Dr. McManus found the plaintiff's reflexes and range of motion to be normal in his right arm and in both hips and knees and also found that straight leg raising test on the left was normal (Tr. 237-38). The plaintiff had a positive straight leg raise test on the right, which was limited to 75% of normal. The plaintiff's neck movements of flexion, extension, and lateral deviation were normal (*id*.). Dr. McManus' impression was that the plaintiff had marked and severe complete paralysis of the left upper extremity and severe atrophy of the same (Tr. 238).

In September 2004, state agency physician James Weston, M.D., reviewed the medical evidence of record (Tr. 239-46). He opined that the plaintiff could frequently lift 25 pounds; occasionally lift 50 pounds; and sit, stand, or walk for a total of six hours in an eight-hour workday (*i.e.*, perform medium work, *see* 20 C.F.R. § 416.967(c)), but that he was limited in his ability to push and pull in the upper extremities, due to his left arm impairment (Tr. 240). Dr. Weston further opined that the plaintiff could never climb ramps,

7

stairs, ladders, ropes, or scaffolds; and was limited in his reaching, handling, fingering, and feeling abilities (Tr. 241-42).

In June 2006, the plaintiff attended another consultative examination, this time with neurologist Richard Eisenberg, M.D. (Tr. 276-77).  Dr. Eisenberg observed that the plaintiff had a "flaccid atrophic left arm with no movement proximally or distally," with diminished sensation and no deep tendon reflexes, but that strength and deep tendon reflexes were normal in his right arm and in both lower extremities (Tr. 276).  He noted that the plaintiff was able to perform finger-to-nose movement on the right and heel-to-shin movement bilaterally with normal muscle coordination and that he "walk[ed] well" (*id*.).  Dr. Eisenberg opined that the plaintiff was "not able to perform any jobs requiring the use of the left arm" and added:  "Given his educational background of only having gone through the 9th grade I feel he is essentially disabled from any gainful employment." (Tr. 276-77).  He nevertheless opined that "[t]heoretically if he could be trained for a job which requires only the use of the right arm this could be possible" (Tr. 277).

Later in June 2006, state agency physician Robert Kukla, M.D., examined the medical evidence of record and determined that the plaintiff's primary diagnosis was left brachial plexopathy (Tr. 278-85).  He opined that the plaintiff could frequently lift 10 pounds, occasionally lift 20 pounds; and sit, stand, or walk for six hours in an eight-hour workday (*i.e.*, perform light work, *see* 20 C.F.R. § 416.967(b)), but was limited in his ability to push and pull in the upper extremities due to his left arm impairment (Tr. 279).  Dr. Kukla also opined that the plaintiff could only occasionally climb ladders, ropes, or scaffolds, and was limited in his reaching, handling, fingering, and feeling abilities in his left arm, and should avoid concentrated exposure to hazards (Tr. 280-82).  He further noted that the medical evidence did "not support any other limitations," noting that the plaintiff had "full strength" in his right arm and in both legs (Tr. 279).

8

In July 2007, consultative physician Susan Tankersley, M.D., examined the plaintiff (Tr. 306-09). Dr. Tankersley noted that the plaintiff's left arm was numb except for a "small area of skin overlying his posterior shoulder," that his only movement in that arm was a "few degrees of shoulder shrug," and that he had "frequent painful paresthesias" in that arm. She also noted that he had some "burning and stinging" in his neck, which he was able to relieve by flexing his neck forward, and that as a result he almost always looked down (Tr. 306, 308). The plaintiff told Dr. Tankersley that a chiropractor had adjusted his neck one year earlier, but that his pain had not significantly decreased as a result; he also said that he treated the pain primarily with over-the-counter analgesics and topical salves (Tr. 306). Dr. Tankersley noted that the plaintiff was "getting better at functioning with one hand" but was still unable to tie his shoes or to use buttons (*id.*).

In addition to the left arm atrophy, Dr. Tankersley detected "what feels to be a clavicular malunion" (Tr. 308). She observed normal strength and range of motion in his right arm and in both legs and "no rest or intention tremors or bradykinesis" (*id.*). She noted "some cervical straightening" in the spine," "some paraspinous muscle spasms at cervical level along with some right-sided strap muscle and trapezius muscle spasms," and "decrease in extension at the neck of about 5 degrees" (*id.*). The plaintiff could rotate 60 degrees to the left and to the right, and his left and right lateral flexion was reduced to 40 degrees (Tr. 308-09). His lumbar spine range of motion remained intact, and straight leg raise testing was negative in both the sitting and supine positions (Tr. 309). Dr. Tankersley's main diagnosis was "left brachial plexopathy with profound flaccid paresis [and] painful sensory neuropathy of the entire left upper extremity," but she suggested that the plaintiff's neck might warrant further examination and advised that an X-ray or MRI be taken (*id.*). She also added: "Like Dr. Eisenberg, I believe that his injury renders him unemployable for any position commensurate with his education level" (*id.*).

9

In August 2007, state agency physician Ellen Humphries, M.D., reviewed the medical evidence of record, including Dr. Tankersley's report (Tr. 311-17). She opined that the plaintiff was capable of light work and was not limited in his ability to push and pull, except that his left arm impairment limited his lifting and carrying abilities (Tr. 311). She further opined that the plaintiff could never crawl or climb ladders, ropes, or scaffolds; that he could only occasionally balance, stoop, kneel, crouch, or climb ramps and stairs; and that his reaching, handling, fingering, and feeling abilities were limited by his left arm impairment (Tr. 312-13).

On July 30, 2009, the plaintiff appeared with counsel and testified in support of his application at the hearing before the ALJ (Tr. 37-53). He testified that he could not use his left arm or hold it up and that he felt pain between his left shoulder and elbow, as well as his neck (Tr. 45). He stated that picking up anything "more than a clothes basket" caused pain between his head and left shoulder and also caused him to drop things (Tr. 46-47). The plaintiff admitted that he was not currently taking any medication for the pain, explaining that he had taken prescription pain medication when he first got out of the hospital following his accident, but had stopped three months later, because he did not want to become addicted (Tr. 45-46). He also stated that holding his head down relieved the pain "a little" (Tr. 47).

The plaintiff testified that he lived with his mother and tried to help her with housework such as "picking up loose things off the floor" and "straightening up the tables," but that he could not sweep or vacuum and that he also did not cook or do dishes (Tr. 48-49). He also stated that he spent time with his two children, who did not live with him, and took them places such as parks and McDonald's (Tr. 47-48). While he stated that he tried not to drive, because of the pain, the plaintiff admitted that he did drive "sometimes," including with the children (Tr. 48). In addition, the plaintiff mentioned that he had gone to vocational rehabilitation services for "a short period of time" and completed training, but that

10

pain had prevented him from doing the job he was given, which he described vaguely as "working with metal" (Tr. 42, 50).  He stated that his vocational counselor had told him that she would find him another job, but she never did (Tr. 50).  When asked if he had any physical problems other than his left arm limitation and the pain in that area, the plaintiff responded that he did not; he also stated that he had no problem using his right arm or hand (Tr. 51).

Rebecca Bruce, a vocational expert, also testified (Tr. 53-58).  The ALJ first asked her what jobs an individual of the plaintiff's age, education, and experience could perform if he was limited to light work that was simple and unskilled; had no use of the nondominant left upper extremity; could only occasionally stoop, kneel, or crouch; could not crawl or climb ladders, ropes, or scaffolds; and should avoid any more than occasional use of the right upper extremity (Tr. 54-55).  The vocational expert provided three examples of light, unskilled jobs, each of which existed in significant numbers in both the national economy and in South Carolina: (1)  garment sorter, listed as entry number 222.687-014 in the Dictionary of Occupational Titles ("DOT"); (2)  paper cone grader, DOT # 649.687-014; and (3)  storage rental clerk, DOT # 295.367-026 (Tr. 55).  She also provided three examples of sedentary, unskilled jobs that existed in significant numbers nationally and locally: (1) order clerk, DOT # 209.567-014; (2) charge account clerk, DOT # 250.367-014; and (3)  surveillance monitor, DOT # 379.367-014 (Tr. 55).  The plaintiff's counsel then asked the vocational expert whether being limited to the use of one arm would have any impact on the number of jobs "versus . . . just [being] limited to light or sedentary work." (Tr. 56).  She replied:  "Not on these [jobs]." (*Id*.).  When asked to explain further why this particular limitation would not preclude performance of these jobs, the vocational expert explained that she had "reviewed every single [DOT] job description" for the six jobs she had identified while "thinking only one hand" – pointing out that she, personally, had only one hand (Tr. 57).  She stated that she had seen "[a]bsolutely nothing" to suggest that these

11

jobs could not be performed by an individual with this restriction (Tr. 57-58). The plaintiff's counsel then requested an opportunity to leave the record open for two weeks so that he could seek an "alternative vocational opinion," and the ALJ granted this request (Tr. 58). However, the plaintiff did not submit any additional evidence.

## ANALYSIS

The plaintiff alleges disability commencing June 3, 2005, at which time he was 21 years old. He was 25 years old on the date of the ALJ's decision. The ALJ found that the plaintiff has a severe combination of impairments that includes a brachial plexus injury of his nondominant left arm, status-post fractures of the left clavicle and scapula, and a transverse fracture at C6. The ALJ further determined that the plaintiff could perform unskilled light work that does not involve any use of his nondominant left upper extremity, requires no more than occasional stooping, kneeling, and crouching or more than occasional overhead use of his right upper extremity, and involves no crawling or climbing ladders, ropes, or scaffolds. The plaintiff argues the ALJ erred by: (1) failing to properly evaluate whether his impairments meet and/or equal the criteria of Listing 1.04; (2) failing to properly assess his credibility and subjective allegations of disabling pain; (3) failing to properly consider the opinions of the examining physicians; (4) failing to consider the impact of his non-exertional impairments in the residual functional capacity assessment; and (5) relying on vocational testimony that was insufficient to establish that there were other jobs he could perform in significant numbers.

### *Listing 1.04*

At step three of the evaluation, the ALJ concluded that the plaintiff "did not experience the type of injury or limitations outlined in section 1.01 *et seq.* of [20 C.F.R. Part 404, Subpart P,] Appendix 1" (Tr. 29). The plaintiff argues that the ALJ erred in failing to properly evaluate whether his impairments meet and/or equal Listing 1.04 (Disorders of the Spine).

12

Listing 1.04 requires a claimant to show, as relevant here:

Disorders of the spine (e.g., herniated nucleus pulposis, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:

A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine) . . . .

20 C.F.R. Pt. 404, Subpt. P, App. I, § 1.04.

The plaintiff argues that his impairment meets this listing because he had a vertebral fracture – the C6 fracture (Tr. 338-39) – and that his injuries correspond with all the other elements of Listing 1.04(A) (pl. brief at 15-16). In particular, he points to evidence of: (1) neuro-anatomic distribution of pain (Tr. 306 (noting "frequent painful paresthesias" and "neuropathic-type pain" in the left arm)); (2) limitation of motion of the spine (Tr. 308 (noting "some cervical [spine] straightening" and a 5-degree decrease in extension of the neck)); (3) motor loss and atrophy with associated muscle weakness (Tr. 276 (describing the plaintiff's left arm as "flaccid" and "atrophic," with "no movement proximally or distally")); and (4) sensory or reflex loss (Tr. 276 (noting that left arm is paralyzed and that "[d]eep tendon reflexes are absent")).

The Commissioner acknowledges that a more detailed step three analysis would have been preferable but argues that, while each of these elements of Listing 1.04(A) is present, the plaintiff "disregards the listing's two preliminary requirements: that any compromise of a nerve root result from the fracture (or other disorder) and that the evidence indicate nerve root compression" (def. brief at 12, 14). The Commissioner contends that the record indicates that the plaintiff's vertebral fracture at C6 healed and that the nerve

13

impairments were due instead to the plaintiff's brachial plexus injury (*id.*).  In response, the plaintiff argues that the evidence suggests that his problems may be the result of a combination of radiculopathy from the neck condition and the brachial plexus injury and that, in any event, since each of the clinical elements of the listing were met, the ALJ was required to evaluate whether his condition medically equaled the listing.

As argued by the plaintiff, even assuming the Commissioner may be correct in her analysis, the ALJ did not provide any discussion of Listing 1.04(A).  Accordingly, the Commissioner's arguments are post-hoc rationalization. *See Golembiewski v. Barnhart*, 322 F.3d 912, 916 (7th Cir. 2003) ("[G]eneral principles of administrative law preclude the Commissioner's lawyers from advancing grounds in support of the agency's decision that were not given by the ALJ.").  Without the ALJ's analysis, it is impossible to determine whether the finding that the plaintiff's impairments do not meet or medically equal this listing is based upon substantial evidence.  A listing analysis includes identifying the relevant listed impairments and comparing the criteria with the evidence of the plaintiff's symptoms. *See Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir.1986) (stating that "[w]ithout such an explanation, it is simply impossible to tell whether there was substantial evidence to support the determination"); *Beckman v. Apfel*, C.A. No. WMN–99–3696, 2000 WL 1916316, at *9 (D. Md. 2000) (finding that where there is "ample factual support in the record" for a particular listing, the ALJ should perform a listing analysis). *See also* 20 C.F.R. §§ 404.1526(a), 416.926(a) ("Your impairment(s) is medically equivalent to a listed impairment in appendix 1 of subpart P of part 404 of this chapter if it is at least equal in severity and duration to the criteria of any listed impairment.").  Accordingly, upon remand, the ALJ should be instructed to specifically consider and analyze whether the plaintiff's impairments meet or equal Listing 1.04(A) by comparing the listing's criteria with the evidence of record as discussed above.

14

***Credibility***

The plaintiff next argues that the ALJ failed to properly assess his credibility and subjective allegations of disabling pain. The Fourth Circuit Court of Appeals has stated as follows with regard to the analysis of a claimant's subjective complaints:

> [T]he determination of whether a person is disabled by pain or other symptoms is a two-step process. First, there must be objective medical evidence showing the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged. . . . It is only after a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed, that the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated.

*Craig v. Chater*, 76 F.3d 585, 593, 595 (4th Cir. 1996). In *Hines v. Barnhart*, 453 F.3d 559 (4th Cir. 2006), a Fourth Circuit Court of Appeals panel held, "Having met his threshold obligation of showing by objective medical evidence a condition reasonably likely to cause the pain claimed, [the claimant] was entitled to rely exclusively on subjective evidence to prove the second part of the test, i.e., that his pain [was] so continuous and/or severe that it prevent[ed] him from working a full eight-hour day." 453 F.3d at 565. However, the court in *Hines* also acknowledged that "'[o]bjective medical evidence of pain, its intensity or degree (i.e., manifestations of the functional effects of pain such as deteriorating nerve or muscle tissue, muscle spasm, or sensory or motor disruption), if available should be obtained and considered.'" *Id.* at 564 (quoting SSR 90-1p, 1990 WL 300812).

The court further acknowledged:

> While objective evidence is not mandatory at the second step of the test, "[t]his is not to say, however, that objective medical evidence and other objective evidence are not crucial to evaluating the intensity and persistence of a claimant's pain and the extent to which it impairs her ability to work. They most certainly are. Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its

> severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers."

*Id*. at 565 n.3 (quoting *Craig*, 76 F.3d at 595). *See Johnson v. Barnhart*, 434 F.3d 650, 658 (4th Cir. 2005); 20 C.F.R. § 404.1529(c)(2) ("We must always attempt to obtain objective medical evidence and, when it is obtained, we will consider it in reaching a conclusion as to whether you are disabled. However, we will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work solely because the available objective medical evidence does not substantiate your statements."); SSR 96-7p, 1996 WL 374186, at *6 ("[T]he absence of objective medical evidence supporting an individual's statements about the intensity and persistence of pain or other symptoms is only one factor that the adjudicator must consider in assessing an individual's credibility and must be considered in the context of all the evidence.").

A claimant's symptoms, including pain, are considered to diminish his capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical evidence and other evidence. 20 C.F.R. §§ 404.1529(c)(4) and 416.929(c)(4). Furthermore, "a formalistic factor-by-factor recitation of the evidence" is unnecessary as long as the ALJ "sets forth the specific evidence [he] relies on in evaluating the claimant's credibility." *White v. Massanari*, 271 F.3d 1256, 1261 (10th Cir. 2001). Social Security Ruling 96-7p states that the ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record." 1996 WL 374186, at *4. Furthermore, it "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and reasons for that weight." *Id.*

The factors to be considered by an ALJ when assessing the credibility of an individual's statements include the following:

16

(1)     the individual's daily activities;

(2)     the location, duration, frequency, and intensity of the individual's pain or other symptoms;

(3)     factors that precipitate and aggravate the symptoms;

(4)     the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

(5)     treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

(6)     any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

(7)     any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

*Id.* at *3.  *See* 20 C.F.R. §§ 404.1529(c), 416.929(c).

The ALJ acknowledged the plaintiff's testimony that his arm impairment and neck and arm pain caused some functional limitations, but concluded that the record did not support his testimony to the extent he claimed this pain was disabling (Tr. 29-31). In making this finding, the ALJ stated as follows:

Mr. Amiker has indicated that he did not use any prescription pain medication on an ongoing basis after 3 months post-injury. The claimant has been absent from treatment, without complaints of severe pain, for prolonged periods of time.  He has voiced infrequent complaints of flare-ups of his pain.  The types of medications prescribed have not been suggestive of a disabling level of pain.  The claimant is able to engage in activities such as picking up around the house, driving, reading, seeing his girlfriend and his children, attending church, and cleaning off the table. The claimant's treating physicians did not indicate that he was unable to work due to his impairments and related symptoms.  Physicians of record have indicated that he retains the capacity to perform jobs that do not involve use of his nondominant left upper extremity. Vocational Rehabilitation approved him for training as a stock clerk in the retail industry. The claimant has a suboptimal work history from prior to his

17

accident. From the evidence, he has continued to live with family members since his accident, and is presumably supported by them; providing suboptimal motivation to enter the workforce.

(Tr. 31).

The plaintiff disputes the ALJ's statements that he had been "'absent from treatment'" and had "'voiced infrequent complaints of flare-ups of his pain'" (pl. brief at 28 (citing Tr. 31)). However, the only evidence he cites to challenge these findings is treatment records from 2003 and 2004 and the chiropractor's records from October 2006 through February 2007 (*id.* (citing Tr. 206, 213, 249-52, 264, 291-305)), all of which the ALJ acknowledged (Tr. 29-30). Review of the record confirms that, apart from the chiropractor, the plaintiff has not sought any treatment for his pain or other impairments since 2006. Moreover, the ALJ acknowledged the plaintiff's explanation that he took only nonprescription analgesics after 2003 because he did not want to become addicted to painkillers (Tr. 31; *see* Tr. 45-46), but was entitled to find this explanation insufficient absent any evidence of any specific risk of addiction in his case; doctors continued to write the plaintiff temporary prescriptions for painkillers in 2004 and 2005 (Tr. 249-52, 274). It was therefore appropriate for the ALJ to take the plaintiff's limited treatment, among other factors, into consideration. *See Mickles v. Shalala*, 29 F.3d 918, 930 (4th Cir. 1994) (ALJ did not err by considering the inconsistency between claimant's infrequent treatments and her claims of disabling pain).

The plaintiff also takes issue with the ALJ's reliance on his activities of daily living (pl. brief at 29). The ALJ acknowledged that while there were some household chores the plaintiff could not perform, he could pick up things around the house and clear the table, both of which activities necessarily involved reaching and handling with his functional arm (Tr. 31; *see* Tr. 48-49). In addition, while the plaintiff testified that pain sometimes prevented him from driving (Tr. 48), he also admitted that was still able to drive, even with his two young children in the car (Tr. 47-48). This court finds no error in the ALJ's consideration of the plaintiff's activities of daily living.

18

The plaintiff also argues that the ALJ's credibility finding was flawed because of several "dubious" findings (pl. brief at 27).  Specifically, he points to the ALJ's statement that he had a "suboptimal work history" prior to his accident, which occurred when he was 19 years old, and that he "continued to live with family members since his accident, and [was] presumably supported by them, providing suboptimal motivation to enter the work force" (*id.* at 27; *see* Tr. 31).  This court agrees with the plaintiff that his failure to have a substantial work history prior to the age of 19 is not particularly unusual and should not have been a detriment to his credibility.  Furthermore, the fact that he lives with his family should not weigh against his credibility.

As part of his argument that the ALJ failed to properly assess his credibility, the plaintiff also challenges the ALJ's statement that "[p]hysicians of record have indicated that he retains the capacity to perform jobs that do not involve use of his nondominant left upper extremity" (pl. brief at 27-28; *see* Tr. 31).  Specifically, the plaintiff notes that examining physician Dr. Eisenberg stated that he was "essentially disabled from any gainful employment" before qualifying his statement of disability by stating that "theoretically" the plaintiff might be able to be "trained for a job that requires only the use of the right arm. . ." (Tr. 277), and examining physician Dr. Tankersley indicated that his injuries rendered him unemployable (Tr. 309).  The ALJ afforded these opinions little weight, noting that the issue of disability is reserved for the ALJ (Tr. 30-31). *See* 20 C.F.R. § 416.927(d) (medical source opinions on issues reserved to the Commissioner will not be given any special significance).  The ALJ gave "greater weight" to the opinion of a non-examining State agency medical consultant, Dr. Humphries (Tr. 310-17), who opined the plaintiff could perform a limited range of light work (Tr. 31).  The ALJ stated that the "overall evidence" supported this medical consultant's opinion (Tr. 31).

The Commissioner notes that neither Dr. Tankersley nor Dr. Eisenberg were treating physicians and argues that their opinions were, therefore, properly granted less

weight. However, as argued by the plaintiff, this would be pertinent if a treating physician had submitted an opinion; however, there is no opinion from a treating physician in the record. The Social Security regulations state that "[g]enerally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you." 20 C.F.R. § 416.927(c)(1). *See Gordon v. Schweiker*, 725 F.2d 231, 235 (4ᵗʰ Cir. 1984) ("[T]he testimony of a non-examining, non-treating physician should be discounted and is not substantial evidence when totally contradicted by other evidence in the record. . . . [W]e have also ruled that the testimony of a non-examining physician can be relied upon when it is consistent with the record.") (citations omitted). While it was appropriate for the ALJ to give "little weight" to the non-medical opinions of Drs. Eisenberg and Tankersley on the ultimate issue of disability, the ALJ did not acknowledge that Dr. Tankersley specifically indicated that the plaintiff was having additional difficulty with his neck, a limited range of motion of his neck, and the need to keep his neck in flexion as a basis for her opinion (Tr. 308-309). Upon remand, the ALJ should consider this evidence in evaluating the plaintiff's credibility.

Accordingly, upon remand, the ALJ should be instructed to properly assess the plaintiff's credibility in accordance with the foregoing.

### Residual Functional Capacity

The plaintiff next argues that the ALJ erred in failing to consider the impact of his nonexertional impairments in the residual functional capacity ("RFC") assessment. Specifically, the plaintiff claims the ALJ failed to consider his neck pain and inability to hold his head up in combination with his left arm paralysis (pl. brief at 21-22).

Social Security Ruling 96-8p provides:

The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations). In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on

> a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

1996 WL 374184, at *7 (footnote omitted). Further, "[t]he RFC assessment must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence." *Id.*

As discussed above, Dr. Tankersley observed that the plaintiff had diminished neck extension and kept his head in flexion (Tr. 308-309). The plaintiff also testified that he keeps his head down because of the pain and that this affects his ability to drive (Tr. 48). This court agrees that the ALJ erred in failing to consider this in the RFC analysis. Accordingly, upon remand, the ALJ should be instructed to consider the plaintiff's neck problems in assessing his RFC.

### *Vocational Expert*

Lastly, the plaintiff argues that the ALJ erred in failing to have the vocational expert properly explain the conflict between her testimony and the *Dictionary of Occupational Titles* ("*DOT*")-related information as required by Social Security Ruling 00-4p (pl. brief at 26). Social Security Ruling ("SSR") 00-4p provides in pertinent part:

> When a [vocational expert ("VE")] . . . provides evidence about the requirements of a job or occupation, the adjudicator has an affirmative responsibility to ask about any possible conflict between that VE . . . evidence and information provided in the DOT. In these situations, the adjudicator will:
>
> Ask the VE . . . if the evidence he or she has provided conflicts with information provided in the DOT; and
>
> If the VE's . . . evidence appears to conflict with the DOT, the adjudicator will obtain a reasonable explanation for the apparent conflict.

> When vocational evidence provided by a VE . . . is not consistent with information in the DOT, the adjudicator must resolve this conflict before relying on the VE . . . evidence to support a determination or decision that the individual is or is not disabled. The adjudicator will explain in the determination or decision how he or she resolved the conflict. The adjudicator must explain the resolution of the conflict irrespective of how the conflict was identified.

SSR 00-4p, 2000 WL 1898704, at *4.

The plaintiff argues that the ALJ's determination at step five that there were jobs existing in significant numbers in the local and national economy that he could perform despite his impairments was flawed because, according to the *DOT*, each of the three light work jobs identified by the vocational expert has a requirement that is allegedly inconsistent with his RFC (pl. brief at 24). Specifically, he notes that the job descriptions for garment sorter, storage facility rental clerk, and paper cone grader all "require[] frequent gross dexterity actions and frequent reaching" (*id.* & ex. A). The plaintiff further argues that, according to SSRs 96-9p and 85-15, "the reaching and handling that is going to be done on these types of jobs are going to require both hands" and that the "*DOT* job description assumes that the individual has bilateral dexterity and can use both hands" (*id.*) (quoting SSR 85-15, 1985 WL 56857, at *7 ("[L]oss of fine manual dexterity narrows the sedentary and light ranges of work much more than it does the medium, heavy, and very heavy ranges of work.") and SSR 96-9p, 1996 WL 374185, at *8 ("Any *significant* manipulative limitation of an individual's ability to handle and work with small objects with both hands will result in a significant erosion of the unskilled sedentary occupational base.") (emphasis in original)). Accordingly, he argues that there was a contradiction between the vocational expert's testimony and the *DOT*, and the ALJ was therefore required, pursuant to SSR 00-4p, to identify this conflict and obtain an explanation from the vocational expert (*id.* at 25). This court agrees.

22

6:12-cv-02886-RMG     Date Filed 11/06/13     Entry Number 14     Page 23 of 24

After the vocational expert identified three light work jobs and three sedentary jobs that an individual with the plaintiff's limitations could, in her view, perform, the plaintiff's counsel reminded her that, according to SSR 96-9p, "any significant limitation on bilateral fine dexterity is going to cause a significant erosion of [the] unskilled, sedentary base" (Tr. 56). The vocational expert admitted that the plaintiff's limitations would prevent him from performing a number of sedentary unskilled jobs, such as assembly work (*id.*). She nevertheless maintained that these limitations would not prevent an individual with these limitations from performing the specific light and sedentary jobs she had identified (Tr. 56-57). The ALJ then asked the vocational expert about what the DOT says in regard to the identified jobs being performed with one arm (Tr. 57). The vocational expert testified in response that she "went to the *DOT* and re-reviewed the job description on each job." She also noted that she herself had one hand, although unlike the plaintiff she had "very good use of the remaining amount of arm" she had (*id.*). The vocational expert then stated that it was her opinion that the jobs could be performed by an individual with one hand based on the restrictions given by the ALJ (Tr. 57-58). The ALJ stated in the decision that the vocational testimony "was consistent with the information contained in vocational sources such as the [*DOT*] or based on her personal expertise and/or observations" (Tr. 32).

As argued by the plaintiff, the vocational expert appeared to suggest there was no conflict between her testimony and the *DOT* and did not provide an explanation for the conflict. Upon remand, should the sequential evaluation proceed to the fifth step, the ALJ should be instructed to obtain vocational expert testimony to explain the apparent conflict with the *DOT*. In accordance with SSR 00-4p, the ALJ should be further instructed to explain in the decision how he resolved the conflict.

## CONCLUSION AND RECOMMENDATION

Based upon the foregoing, this court recommends that the Commissioner's decision be reversed under sentence four of 42 U.S.C. § 405(g), with a remand of the cause to the Commissioner for further proceedings as discussed above.

IT IS SO RECOMMENDED.

s/ Kevin F. McDonald
United States Magistrate Judge

November 6, 2013
Greenville, South Carolina

24